IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | 80915-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| TVI, INC., d/b/a Value Village, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — The State sued TVI Inc. under the Consumer Protection Act (CPA), chapter 19.86 RCW, alleging that TVI's marketing deceived consumers by creating an impression that TVI is a nonprofit entity and that charities benefit from sales at TVI's Value Village thrift stores. TVI argued its marketing amounts to constitutionally protected charitable solicitation and moved to dismiss the CPA claims. The trial court denied the motion and, after a bench trial, determined that TVI "knew or should have known" that its marketing could deceive consumers. We conclude that TVI's marketing inextricably intertwines commercial speech and charitable solicitation and that statutes regulating charitable solicitation must survive strict constitutional scrutiny. Because the CPA as applied to TVI's marketing does not leave sufficient breathing room for protected speech under the First Amendment to the United States Constitution, we reverse and remand to dismiss the State's CPA claims.

FACTS

TVI is a for-profit corporation that owns and operates several Value Village thrift stores in Washington. It buys donated textiles and household items from selected partner charities[1] at low cost[2] and then sells them to the public at higher prices in its stores. TVI sells unsold items and those unfit for retail sale to recycling centers that ship the items overseas to secondary markets or dispose of the items. TVI also maintains community donation centers at its stores, where it accepts items donated by the public. It then pays its charity partners a fee based on the amount of materials donated directly to each store.

TVI markets itself as a philanthropic company trying to reduce waste, recycle materials, and support its charity partners' work in the community. TVI does not donate directly to charities, and its charity partners do not receive any of its sales revenue. But by buying in bulk from charitable organizations, TVI provides a predictable source of revenue on which the charities heavily rely.

To induce the public to donate and shop at its stores, TVI uses in-store signs and banners, in-store public address announcements, online marketing, brochures, and social media posts. TVI identifies itself as a for-profit company in its marketing and does not tell shoppers it donates profits to charity. That said, it markets slogans that suggest its charitable partners benefit from the amount of items TVI sells. For example, one sign reads, " 'These racks support more than just clothes. By shopping and donating at this store, you support: [charity

---

[1] TVI's main charity partners are Big Brothers Big Sisters of Puget Sound, Northwest Center, and the Arc of Washington State.

[2] TVI buys the items at a set price per pound.

logos][.] Value Village good all around.' " Or, " 'Value Village is about giving back and helping others, too.' " Another states, " 'Donate to a nonprofit here' " and, " 'Clothing [plus] Household Items,' " with a smaller caption that states, " 'Value Village is a for profit professional fundraiser.' " Some advertisements are more detailed:

> "For over 60 years, Value Village has helped charities, communities and the planet prosper through the power of re-use. Our charity partners sell us goods they collect for reliable revenue that helps fund their missions."

Public address announcements made to shoppers include messages like, " 'When you donate your reusable items here at our store, we pay it forward to others in a big way! Your donations mean support for local nonprofits - helping to fund vital programs right here in our community. Pretty awesome, huh?' "

TVI also encourages shoppers to donate at its in-store collection bins with messages like, " '**DO** SOMETHING GREAT **DO** GOOD **DO** YOUR PART **DO**NATE,' " " '**DO** A GOOD DEED **DO** FAVORS **DO** YOUR PART **DO**NATE,' " and, " 'Value Village pays local nonprofits every time you donate. **Thank you!**' " Most Value Village stores use a compilation of these themes in their banners, brochures, and signs. Some stores have a "primary" charity partner highlighted in their advertising. The stores also hand out "stamp cards," giving shoppers discounts on purchased items in exchange for donating goods.

In 2014, the State notified TVI that it must register with the secretary of state as a commercial fundraiser under the charitable solicitations act (CSA),

chapter 19.09 RCW.[3]  TVI complied.  Around the same time, the attorney general's office (AGO) began investigating TVI's marketing for possible CPA violations.[4]  The AGO initiated the investigation after receiving at least one complaint accusing TVI of creating a community perception that it was a nonprofit organization and that charities received direct benefits from its sales at Value Village stores.

Eventually, the State sued TVI under the CSA, alleging that TVI failed to place disclaimers "at the point of solicitation" between January and October 2015, and advertised for solicitations using "false, misleading, or deceptive information."  The State also alleged TVI's marketing was deceptive under the CPA because it created a "deceptive net impression" that TVI is a nonprofit corporation and that customer sales directly benefit charities.  The State also accused TVI of deceptive marketing related to the Rypien Foundation, a charity group dedicated to helping families battling cancer.  In exchange for using the foundation's logos in its marketing and store windows, TVI paid the Rypien Foundation a flat fee of $4,000 per month.[5]  But the State claimed TVI misled consumers into believing it paid the foundation based on the amount of donations to Value Village stores in Spokane.  The State sought injunctive relief as well as

---

[3] The CSA provides Washington consumers with information relating to any entity that solicits funds from the public for charitable purposes to prevent deceptive practices and improper use of contributions intended for charitable purposes.  RCW 19.09.010(1).  It also seeks to improve the transparency and accountability of charitable solicitors.  RCW 19.09.010(2).

[4] The CPA prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.  RCW 19.86.020.

[5] The parties later changed the compensation fee to a flat rate per pound.

civil penalties of up to $2,000 for each CPA violation. It also sought restitution for Value Village customers as well as attorney fees and costs.

TVI moved to dismiss the State's CPA claims as an unconstitutional regulation of protected speech as applied to its marketing. TVI argued that its marketing amounts to charitable solicitation, and statutes regulating charitable solicitation must pass strict constitutional scrutiny. It asserted the CPA cannot pass strict scrutiny because it lacks a mens rea element to protect against liability for unintentional false statements or deception. The trial court agreed that TVI's marketing includes some charitable solicitation subject to constitutional scrutiny. But it did not dismiss the State's CPA claims. Instead, the court required the State to prove at trial that TVI "knew or should have known" its marketing could create a deceptive net impression.

The case proceeded to bench trial. At the close of the State's case, TVI again moved to dismiss the CPA claims, arguing that the State failed to satisfy First Amendment strict scrutiny standards. The court denied the motion. After trial, the court determined that the State satisfied its burden of proof on three of its seven claims.[6] The court found the State proved that (1) before 2016, TVI used advertising that had the capacity to deceive consumers by suggesting that TVI itself was a nonprofit entity; (2) TVI used ads that had the capacity to mislead the public into believing that purchasing items at a Value Village store would "benefit the downtrodden, the poor, those who need charity"; and (3) TVI used

---

[6] The trial court dismissed the State's allegations that (1) TVI deceived the public into believing charities were paid for every donation, (2) TVI deceived the public into believing only primary charities received payment for donations, (3) TVI misled consumers about how much it paid the Moyer Foundation, and (4) TVI violated CSA disclosure requirements.

ads that had the capacity to deceive shoppers into believing the Rypien Foundation received money for each item donated. The court entered findings of fact and conclusions of law.

TVI petitioned for discretionary review before the trial court determined damages. A commissioner of this court granted TVI interlocutory discretionary review.

ANALYSIS

TVI argues that the CPA, as applied to its marketing, unconstitutionally chills protected speech—charitable solicitation. The State counters that TVI's marketing amounts to only commercial speech properly regulated under the CPA. In the alternative, the State argues that the CPA as applied to TVI's marketing survives strict scrutiny under the trial court's "knew or should have known" standard. We agree with TVI.

Standard of Review

We interpret statutes and constitutional provisions de novo. City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009); Fed. Way Sch. Dist. No. 210 v. State, 167 Wn.2d 514, 523, 219 P.3d 941 (2009). We also review challenges invoking the right to free speech under the First Amendment de novo. Catlett v. Teel, 15 Wn. App. 2d 689, 699, 477 P.3d 50 (2020) (citing Resident Action Council v. Seattle Hous. Auth., 162 Wn.2d 773, 778, 174 P.3d 84 (2008)). Generally, we presume statutes to be constitutional, and the party challenging a statute bears the burden of proving otherwise. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008); Voters Educ. Comm. v. Pub. Disclosure

Comm'n, 161 Wn.2d 470, 481, 166 P.3d 1174 (2007).  But the State " 'usually bears the burden of justifying a restriction on [free] speech.' "  State v. Immelt, 173 Wn.2d 1, 6, 267 P.3d 305 (2011)[7] (quoting Voters Educ. Comm., 161 Wn.2d at 482).

In assessing a First Amendment challenge, we first determine whether the speech at issue is constitutionally protected.  Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 475, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989).  In doing so, we conduct " 'an independent review of the record . . . to be sure that the speech in question actually falls within [a] protected category.' "  Playtime Theaters, Inc. v. City of Renton, 748 F.2d 527, 535 (9th Cir. 1984) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 505, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)), rev'd on other grounds by City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986).  Then we scrutinize the law regulating the speech under an evidentiary standard that matches the First Amendment interest at play.  Thomson v. Doe, 189 Wn. App. 45, 57, 356 P.3d 727 (2015).

Commercial Speech

"Commercial speech" is "expression related solely to the economic interests of the speaker and its audience."  Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561-62, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).  It is speech which does " 'no more than propose a commercial transaction.' "  State Bd. of Va. Pharmacy v. Va. Citizens Consumer Council, Inc.,

---

[7] Internal quotation marks omitted.

425 U.S. 748, 762, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) (quoting Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 385, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973)). The First Amendment protects commercial speech from unwarranted governmental regulation. Va. Citizens Consumer Council, 425 U.S. at 761-62. Statutes regulating commercial speech are subject to an intermediate level of constitutional scrutiny. Cent. Hudson, 447 U.S. at 563-66.

The First Amendment's concern for commercial speech turns on the informational function of advertising. See First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978). As a result, "there can be no constitutional objection" to suppressing commercial messages that do not accurately inform the public. Cent. Hudson, 447 U.S. at 563. The government may ban commercial communications that are more likely to deceive the public than to inform it. Friedman v. Rogers, 440 U.S. 1, 15-16, 99 S. Ct. 887, 59 L. Ed. 2d 100 (1979). But commercial speech should not be defined too broadly "lest speech deserving of greater constitutional protection be inadvertently suppressed." Cent. Hudson, 447 U.S. at 579 (Stevens, J., concurring).

In assessing whether a communication is commercial speech, we consider whether (1) the communication is an advertisement, (2) the communication refers to a particular product, or (3) the speaker has an economic motivation. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983); Dex Media W., Inc. v. City of Seattle, 696 F.3d

8

952, 958 (9th Cir. 2012). No one factor is dispositive. Bolger, 463 U.S. at 66-67. And a communication is not necessarily commercial just because "it relates to that person's financial motivation." Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 795-96, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988).

Here, TVI's marketing amounts to commercial speech. Its signs, banners, and in-store announcements induce customers to donate goods at its stores, which TVI then sells for profit. The marketing also encourages shoppers to buy goods in its stores so TVI can generate greater profits. While the signs and announcements do not refer to particular products, they are advertisements communicated by a for-profit corporation with economic motivation.

Charitable Solicitation

Charitable solicitation is fully protected speech under the First Amendment. Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632-33, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980); Sec. of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 959-60, 104 S. Ct 2839, 81 L. Ed. 2d 786 (1984); Riley, 487 U.S. at 787-88. Statutes seeking to regulate charitable solicitation are subject to strict constitutional scrutiny. Riley, 487 U.S. at 790. That is, the State "bears the 'well-nigh insurmountable' burden to prove a compelling interest that is both narrowly tailored and necessary to achieve the State's asserted interest." State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wn.2d 618, 628, 957 P.2d 691 (1998) (quoting Meyer v. Grant, 486 U.S. 414, 425, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988)).

9

The dictionary defines "solicitation" as "the pursuit, practice, act, or an instance of soliciting." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2169 (2002). "Solicit" means "to approach with a request or plea (as in selling or begging)," and "to endeavor to obtain by asking or pleading." WEBSTER'S, at 2169. But charitable solicitation encompasses more than the mere act of seeking financial support for nonprofit organizations. See Schaumburg, 444 U.S. at 632; Riley, 487 U.S. at 798. It is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues." Schaumburg, 444 U.S. at 632. "[W]here the solicitation is combined with the advocacy and dissemination of information, the charity reaps a substantial benefit from the act of solicitation itself." Riley, 487 U.S. at 798. Charitable solicitation informs the public about the charity's existence and goals, shares and propagates its views, and advocates its causes. Schaumburg, 444 U.S. at 632.

Charitable solicitation is not limited to in-person communications. Nat'l Fed. of the Blind of Tex., Inc. v. Abbott, 647 F.3d 202, 212 (5th Cir. 2011). In Abbott, for-profit entities collected donated goods in "receptacles" bearing logos of local charities. Abbott, 647 F.3d at 207, 213. They then paid the charities a flat fee for the goods and resold them for profit. Abbott, 647 F.3d at 207. The court concluded that including the names of local charities on donation bins constitutes charitable solicitation because doing so communicates information about the nonprofit and explicitly advocates for the donation of clothing and household goods to that particular charity. Abbott, 647 F.3d at 212-13. The

10

donation bins are "silent solicitors and advocates for particular charitable causes" that "implicitly advocate for that charity's views, ideas, goals, causes, and values." Abbott, 647 F.3d at 213.

Like the donation bins in Abbott, TVI's signs, pamphlets, and banners display the names and logos of its charity partners. For example, TVI displays signs saying, "Thank you for shopping and donating. Your support helps benefit: [Big Brothers Big Sisters of Puget Sound logo]." And, "Value Village is about giving back and helping others, too. . . . In this area, your donations support: [Northwest Center logo]." These communications at least implicitly advocate for the views, ideas, goals, causes, and values of TVI's charitable partners. As a result, TVI's marketing also amounts to charitable solicitation.

Intertwined Speech

We treat communications that contain both commercial speech and noncommercial speech—here, charitable solicitation—as commercial speech unless the commercial and noncommercial messages are "inextricably intertwined." See Riley, 487 U.S. at 795-96. We determine whether the commercial aspects of the speech are "inextricably intertwined with otherwise fully protected speech" based on "the nature of the speech taken as a whole." Riley, 487 U.S. at 796. "[W]here the two components of speech can be easily separated, they are not 'inextricably intertwined.' " Hunt v. City of L.A., 638 F.3d 703, 715 (9th Cir. 2011), aff'd, 523 F. App'x 493 (9th Cir. 2013). But if "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to

another phrase . . . . [W]e apply our test for fully protected speech. Riley, 487 U.S. at 796.

Citing Hunt and Fox, the State argues that TVI's charitable solicitation is easily separated from its commercial speech. In Hunt, boardwalk vendors challenged city ordinances restricting when and where they could sell their goods as unconstitutionally infringing on protected speech.[8] Hunt, 638 F.3d at 706-09. The court rejected their challenge. Hunt, 638 F.3d at 717. It reasoned that any protected speech could be easily separated from the vendors' commercial activity because they were "simply explaining the use and meaning of their products in an attempt to convince passers-by to purchase them." Hunt, 638 F.3d at 715-17. The products on their own did not have "any inherently communicative elements that make their sale constitute expressive activity, and nothing prevents [the vendors] from espousing their beliefs without selling these products." Hunt, 638 F.3d at 717. Similarly, in Fox, the United States Supreme Court determined that it could separate commercial speech promoting the sale of Tupperware from protected speech educating potential customers about home economics because nothing "prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages." Fox, 492 U.S. at 473-74.

---

[8] One vendor claimed protected speech because he was selling shea butter by demonstrating its " 'healing power' " on passers-by, and his sales stand was the " 'Garden of Eve.' " Hunt, 638 F.3d at 708. Another vendor argued he was engaged in protected speech because he explained to customers the meaning of religious and mythical symbols engraved on his incense holders. Hunt, 638 F.3d at 708.

Unlike the boardwalk vendors in <u>Hunt</u> or the Tupperware salespeople in <u>Fox</u>, sales of TVI's goods are directly related to its noncommercial message. TVI buys its inventory from charity partners and pays the charities a fee for goods donated directly to Value Village stores. Marketing this relationship benefits both TVI and its charity partners. Moreover, the State does not seek to regulate when and where TVI sells its goods. Rather, by alleging that TVI markets its relationship with its charity partners in a manner that can deceive consumers, the State aims its lawsuit squarely at TVI's intertwined speech. It asserts that TVI is using its charity partners' "names and logos to encourage consumers to donate goods that it can then resell at a substantial profit," and that TVI is using "the names and logos of the charities to encourage consumers to shop at its stores by creating the illusion that Value Village is a charitable or nonprofit organization."

Taken as a whole, we conclude TVI's commercial and noncommercial speech is inextricably intertwined. As a result, we apply strict scrutiny to the State's attempt to regulate TVI's charitable solicitation under the CPA.

<u>Application of CPA to Charitable Solicitation</u>

Under strict scrutiny, we will uphold a statute restricting protected speech only if it serves a compelling state interest[9] and is "narrowly drawn . . . to serve th[at] interest[ ] without unnecessarily interfering with First Amendment freedoms." <u>Schaumburg</u>, 444 U.S. at 636-37. The restriction must be the " 'least restrictive means among available, effective alternatives.' " <u>United States v. Alvarez</u>, 567 U.S. 709, 729, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) (quoting

---

[9] The parties agree that the State has a compelling interest in "polic[ing] deceptive speech."

Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004)).

The United States Supreme Court has three times considered prophylactic statutes designed to combat fraud or deception in charitable solicitation. See Ill. ex rel. Madigan v. Telemktg. Assocs., Inc., 538 U.S. 600, 617, 123 S. Ct. 1829, 155 L. Ed. 2d 793 (2003) (citing Schaumburg, 444 U.S. 620; Munson Co., 467 U.S. 947; Riley, 487 U.S. 781). Each time, it held the prophylactic measures categorically restrained solicitation and were unconstitutionally burdensome and unnecessary to achieve the state's goal of preventing donors from being misled. See Schaumburg, 444 U.S. at 637; Munson Co., 467 U.S. at 967-68; Riley, 487 U.S. at 794-95. Even so, the Court "took care to leave a corridor open for fraud actions to guard the public against false or misleading charitable solicitations." Madigan, 538 U.S. at 617. Actions targeting fraud fall on the constitutional side of the line because they are aimed at fraud itself rather than "aimed at something else in the hope that it would sweep fraud in during the process." Munson Co., 467 U.S. at 969-70. Still, "falsity alone may not suffice to bring the [protected] speech outside the First Amendment. The statement must be [at least] a knowing or reckless falsehood." Alvarez, 567 U.S. at 719. As a result, any statute targeting false or misleading charitable solicitation must meet "[e]xacting proof requirements" to provide "sufficient breathing room for protected speech," ensuring that a "[f]alse statement alone does not subject a fundraiser to fraud liability." Madigan, 538 U.S. at 620.

14

In Madigan, the Illinois AGO brought common law and statutory fraud claims against for-profit professional fundraisers, alleging they engaged in fraudulent charitable solicitation. Madigan, 538 U.S. at 606-08. The solicitors moved to dismiss the claims as barred by the First Amendment. Madigan, 538 U.S. at 609. The court concluded that "a properly tailored fraud action targeting fraudulent representations themselves employs no '[b]road prophylactic rul[e].' " Madigan, 538 U.S. at 619[10] (quoting Schaumburg, 444 U.S. at 637). The elements of Illinois' fraud action adequately safeguarded against liability for false statements alone because the state had to show by "clear and convincing evidence" that the fundraiser made a "false representation of a material fact" and that the statement was made "with the intent to mislead the listener, and succeeded in doing so." Madigan, 538 U.S. at 620.

Here, the State sued TVI under the CPA. To prevail on a CPA claim, the State must prove only three elements: "(1) [A]n unfair or deceptive act or practice (2) occurring in trade or commerce, and (3) public interest impact." State v. Kaiser, 161 Wn. App. 705, 719, 254 P.3d 850 (2011). The State can establish an unfair or deceptive act by showing (1) per se unfair or deceptive conduct,[11] (2) an act that has the capacity to deceive a substantial portion of the public, or (3) an unfair or deceptive act or practice that is not regulated by statute

---

[10] Alterations in original.

[11] Violation of the CSA is per se unfair or deceptive conduct under the CPA. See RCW 19.09.340(1). The State alleged in its complaint that TVI violated the CSA by failing to place disclaimers "at the point of solicitation" between January and October 2015 and by advertising for solicitations using "false, misleading, or deceptive information." The trial court dismissed the disclaimer allegation. But it does not appear from the record that the State argued or that the court ruled on the State's deceptive advertising claim under the CSA.

but violates the public interest. State v. Mandatory Poster Agency, Inc., 199 Wn. App. 506, 518, 398 P.3d 1271 (2017).

> The CPA does not define "deceptive," but "the implicit understanding is that the actor <u>misrepresented</u> something of material importance."  A deceptive act or practice is measured by "the net impression" on a reasonable consumer.

Mandatory Poster Agency, 199 Wn. App. at 519[12] (quoting Kaiser, 161 Wn. App. at 719; Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 50, 204 P.3d 885 (2009)).

The CPA "significantly differs from traditional common law standards of fraud and misrepresentation." Deegan v. Windermere Real Estate/Ctr.-Isle, Inc., 197 Wn. App. 875, 884, 391 P.3d 582 (2017).  The purpose of the CPA is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition."  RCW 19.86.920; Panag, 166 Wn.2d at 37.  The statute operates prophylactically in that the plaintiff need not show the speaker intended to deceive or succeeded in doing so, only that the communication "had the capacity to deceive a substantial portion of the public."  Panag, 166 Wn.2d at 47.

Here, unlike the fraud claim in Madigan, the elements of the State's CPA claim lack the exacting proof requirements "critical to First Amendment concerns," and do not give "sufficient breathing room for protected speech." Madigan, 538 U.S. at 617, 620.

---

[12] Footnote omitted; internal quotation marks omitted.

Citing United Seniors Ass'n, Inc. v. Social Security Administration, 423 F.3d 397, 407 (4th Cir. 2005), the State argues that despite Madigan, the government can regulate deception in charitable solicitation without showing that recipients were intentionally or "actually misled." In United Seniors, a nonprofit challenged a federal statute prohibiting the use of words or symbols associated with the Social Security Administration in advertising or solicitations " 'in [a] manner which such person knows or should know would convey, or in a manner which reasonably could be interpreted or construed as conveying, the false impression that such item is approved . . . by the Social Security Administration.' " United Seniors, 423 F.3d at 400 (quoting Social Security Act, § 1140(a)(1)(A), as amended, 42 U.S.C. § 1320(b)-10(a)(1) (2005)).

The court recognized the statute reached both deceptive and protected speech. United Seniors, 423 F.3d at 406-07. It concluded that the statute's first prong "plainly reaches only deceptive speech by prohibiting uses of the words that a person 'knows or should know would convey' the false impression of governmental endorsement." United Seniors, 423 F.3d at 407 (quoting § 1140(a)(1)(A)). But the second prong could reach some protected speech because it "does not require the speaker to have an intent to deceive." United Seniors, 423 F.3d at 407. Still, the court let both prongs of the statute stand because "any such non-commercial, non-deceptive speech protected by the First Amendment constitutes, at most, a minuscule portion of the speech reached by the statute." United Seniors, 423 F.3d at 407-08.

Unlike the statute in United Seniors, Washington's CPA has no mens rea element and, as applied to TVI, reaches much more than a "miniscule" portion of protected speech.[13] See United Seniors, 423 F.3d at 407.

Finally, the State argues that even if strict scrutiny demands the CPA meet exacting proof requirements, the " 'Knew or Should Have Known' Standard Imposed by the Trial Court Passes Constitutional Muster." We disagree. While it is true that a trial court may construe an ambiguous law to avoid constitutional infirmity, it is barred by the separation of powers from rewriting the law's plain terms. City v. Willis, 186 Wn.2d 210, 219, 375 P.3d 1056 (2016). Particularly in a First Amendment challenge, " '[w]e will not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish [the legislature's] incentive to draft a narrowly tailored law in the first place.' " Willis, 186 Wn.2d at 219-20[14] (quoting United States v. Stevens, 559 U.S. 460, 481, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)).

The CPA is not ambiguous and requires no interpretation. The CPA does not include a mens rea element. The trial court erred in rewriting the law to

---

[13] National Taxpayers Union v. United States Social Security Administration, 302 Fed. App'x 115 (3d Cir. 2008), also cited by the State, does not compel a different result. That case interprets the same federal statute as United Seniors and reaches the same result. Nat'l Taxpayers, 302 Fed. App'x at 119-20. Nor does United States Corps. for Character, L.C., 116 F. Supp. 3d 1258 (D. Utah 2015), bolster the State's argument. That court determined that fraud is not the only claim that may survive strict scrutiny as applied to protected speech, but did not reach the merits as to any other causes of action to decide constitutional infirmity. Corps. for Character, 116 F. Supp. 3d at 1267-68. Finally, the State cites In re Breast Cancer Prevention Fund, 574 B.R. 193 (Bankr. W.D. Wash. 2017), as an example of a case that "implicitly rejected a First Amendment defense similar to the one raised by Value Village." But that bankruptcy case addresses only a statutory vagueness challenge. See Breast Cancer Prevention, 574 B.R. at 225.

[14] Alterations in original; internal quotation marks omitted.

include a "knew or should have known" mens rea element to avoid constitutional infirmity as applied to TVI's charitable solicitation.

In sum, the CPA as applied to TVI's inextricably intertwined commercial and noncommercial speech does not meet the exacting proof requirements necessary to give protected speech sufficient breathing room under the First Amendment. We reverse and remand for the trial court to dismiss the State's CPA claims.[15]

_Brennan, J._

WE CONCUR:

_Mann, C.J._        _Appelwick, J._

---

[15] The State asks for attorney fees under RCW 19.86.080 and RAP 18.1. RCW 19.86.080(1) gives the court discretion to award the prevailing party in a CPA action "the costs of said action including a reasonable attorney's fee." Similarly, RAP 18.1(a) authorizes attorney fees for the prevailing party on appeal. Because the State is not the prevailing party, we deny its request.